In the Matter of the Application for Letters of Guardianship of the Person and Property of JOEL WOLFE THORNE, JR., an Infant, under the Age of Fourteen Years.

MARY CASEY THORNE, Appearing Specially, Appellant; VICTOR CORSE THORNE and Others, Respondents.

Second Department, April 17, 1925.

Guardian and ward — jurisdiction of Surrogate's Court to appoint general guardian of infant under Surrogate's Court Act, § 174 — father secured divorce from mother and was given custody of child — father resided in Dutchess county at time of his death — mother resided in New York county — domicile of mother became domicile of child as soon as father died — decree of divorce awarding custody of child to father does not change rule — surrogate of Dutchess county had no jurisdiction.

The surrogate of Dutchess county did not have jurisdiction under section 174 of the Surrogate's Court Act to appoint a general guardian of an infant after

the death of his father, since it appears that while the father resided in Dutchess county at the time of his death, the mother, from whom the father had secured a decree of absolute divorce which granted him the sole custody of the child, resided in New York county at the time of the father's death and had resided there for some years.

Under the circumstances, the domicile of the mother became the domicile of the child as soon as the father died, and the surrogate of Dutchess county did not, therefore, have jurisdiction of the child under section 174 of the Surrogate's Court Act.

The fact that the father was awarded sole custody of the child by the decree of divorce does not change the rule, for the effect of that decree died with the father.

MANNING and KAPPER, JJ., dissent.

APPEAL by Mary Casey Thorne, appearing specially, from an order of the Surrogate's Court of the county of Dutchess, entered in the office of said Surrogate's Court on the 27th day of January, 1925, denying the application of Mary Casey Thorne, the mother of the above-named infant, Joel Wolfe Thorne, Jr., to vacate and set aside as irregular and void the orders of the said Surrogate's Court, entered July 2, 1924, directing that letters of guardianship of the person of said infant issue to Samuel Thorne and that letters of guardianship of his estate issue to Victor Corse Thorne, Samuel Brinckerhoff Thorne and the Central Union Trust Company of New York, and also the usual letters of guardianship issue to said persons on July 2, 1924, by the clerk of said court pursuant to such orders.

*John J. Kirby* [*Frank C. Laughlin* with him on the brief], appearing specially for Mary Casey Thorne, appellant, and only for the purpose of vacating the orders and letters of guardianship entered herein on July 2, 1924.

*Chase Mellen* [*William Hazen Peck* with him on the brief], for the respondents.

YOUNG, J.:

Joel Wolfe Thorne and Mary Casey were married in New York county on November 1, 1911. A child was born in New York county October 16, 1914. This child remained with his mother until August 24, 1918, when the mother states that he was taken from her by stealth at the instigation of the father and placed in the custody of a woman unrelated to the family in Denver, Col., and that she did not know where the child was from this time until his father's death in May, 1924.

In June, 1919, Mary Casey Thorne began an action in the Supreme Court, New York county, against her husband, Joel Wolfe Thorne, for a separation on the ground of desertion, cruelty and

inhuman conduct. By supplemental answer the defendant's husband charged defendant with adultery and asked for an absolute divorce. The issues were sent to a referee, who found that the charges made by the husband were sustained and reported in favor of the husband, and an interlocutory decree of divorce was thereafter entered on October 21, 1921, and final decree was entered on July 25, 1922. The final decree awarded the sole custody of the child to the father. The referee's report contained a finding that Mary Casey Thorne, the plaintiff, was not fit, competent or a proper person to have the custody of the infant child. This report was confirmed by the interlocutory judgment.

The plaintiff appealed from the final judgment of divorce, and the Appellate Division, First Department, unanimously affirmed the judgment on May 29, 1924. (See *Thorne* v. *Thorne*, 209 App. Div. 820; 210 id. 55.)

On the following day, May 30, 1924, Mr. Thorne was killed. At the time of his death he was undoubtedly a resident of Millbrook, Dutchess county. He had a large estate there and had resided there at least three years prior to his death. His will was proved in Dutchess county on July 7, 1924. By this will Mr. Thorne appointed Victor Corse Thorne and Samuel B. Thorne, his cousins, and the Central Union Trust Company of New York testamentary guardians of the infant's property, and he likewise named Samuel B. Thorne to be the guardian of the person of the infant.

Before the will was proved in Dutchess county, but after a citation therefor had been issued, the mother, Mary Casey Thorne, on June 16, 1924, presented a petition to the surrogate of New York county, asking her appointment as guardian of the person of her child, and that a New York trust company should be appointed guardian of his property.

The surrogate of New York county issued a citation upon the petition of the mother, returnable July 15, 1924. After this citation was issued, but before its return, the executors named in Mr. Thorne's will presented a petition to the surrogate of Dutchess county, asking for the appointment of guardians for the infant and his property, and the surrogate of Dutchess county forthwith and *ex parte*, without the issue of any citation, on July 2, 1924, appointed Victor Corse Thorne, Samuel B. Thorne and the Central Union Trust Company of New York guardians of the infant's property. As guardians of the person of the infant, however, the surrogate did not appoint Samuel B. Thorne, who had been named by the testator as guardian of the person of the infant, but did appoint his brother, Samuel Thorne.

These orders were entered on July 2, 1924, five days before the will was proved in Dutchess county. Upon the return of the citation issued by the surrogate of New York county, on July 15, 1924, he was informed as to what had occurred in Dutchess county, and that the guardians of the person and estate of the infant had already been appointed, and the surrogate of New York county thereupon declined at that time to go further with the proceeding, but directed that an application be made to the surrogate of Dutchess county to vacate the orders made by him on the ground that they were made without jurisdiction and were consequently void. This was done, but the surrogate of Dutchess county denied the motion to vacate, and from the order entered thereupon this appeal is taken.

In this order now appealed from, the surrogate of Dutchess county gave permission to Mary Casey Thorne to appear in the proceeding and apply to the court to vacate the letters of guardianship granted by the surrogate, and it was provided that if she should so appear, the proceedings for the appointment of guardians of the person and estate of the infant should be opened and the said Mary Casey Thorne should be heard therein as though originally served with a citation, but the surrogate provided that the letters of guardianship already issued by him should remain in full force and effect until the final determination of her application. This invitation was not accepted, but an appeal was taken from the order. In the proceeding to vacate before the surrogate of Dutchess county, Mary Casey Thorne appeared specially.

The principal question presented by this appeal is as to the jurisdiction of the Surrogate's Court of Dutchess county to make the orders of July 2, 1924, appointing guardians of the person and estate of the infant. Whether or not the Surrogate's Court had such jurisdiction depends upon the residence or domicile of the infant after the death of the father on May 30, 1924. While it is conceded that the infant's domicile was in Dutchess county at the time of his father's death, it is contended by the appellant that the instant the father died, the domicile of the mother became also the domicile of her child.

Of course, the attempted apointment of guardians for the infant by the father's will was not in accord with the provisions of the Domestic Relations Law. (Dom. Rel. Law, § 81; *Matter of Waring*, 46 Misc. 222; *Matter of Drowne*, 56 id. 417; *Matter of Underhill*, 116 id. 50.)

The jurisdiction of the Surrogate's Court to appoint a general guardian is defined by the Surrogate's Court Act as follows:

42

" § 174. Jurisdiction to appoint general guardian. Where an infant has no guardian, a Surrogate's Court has jurisdiction to appoint a general guardian of an infant's person, or property, or of both, in the following cases:

" 1. Where the infant is a resident of that county, or has sojourned in that county for at least one year immediately preceding the application.

" 2. Where the infant is not a resident of the State, but has property, real or personal, situated in that county."

The general rule undoubtedly is that the domicile of a parent determines the domicile of the infant child, even though the child be not actually living with the parent.

In *Ryall* v. *Kennedy* (67 N. Y. 379) the father of the infant child had lived for seven months in New York city. His wife and child were on their way across the ocean to live with him and while the ship was being fumigated the child was poisoned and died. It was held that an action brought by the father as administrator to recover damages for wrongfully causing the death of the child might be maintained in New York county; that the evidence was sufficient to show that the father was domiciled in New York, and that, this being so, it necessarily followed that the domicile of the infant was the same as that of the father.

In *Matter of Hubbard* (82 N. Y. 90) it was held that the domicile of the father was in Rhode Island, where he was confined in an insane asylum, although up to the time he was declared insane he lived in New York, it appearing that his children had lived with a relative in Rhode Island, although one of the children had been taken out of the State apparently on account of the litigation relative to guardianship.

In *Brown* v. *Lynch* (2 Brad. 214) it was said: " Authorities of great weight and distinction have differed materially as to the manner in which a change of the minor's domicile may be effected, particularly as to the power of the guardian, or of the mother after the decease of the father. * * * I have no doubt, however, that the weight of modern authority is in favor of the proposition that the surviving mother may change the domicile of her minor children, provided it be without fraudulent views to the succession of their estate. This power did not exist in the Roman law, which may account for the resistance it has met. It is supported by the authority of Bynkershoek, Voet, and Pothier, Sir Wm. Grant, Justice STORY and Chancellor KENT. (*Potinger* v. *Wightman*, 3 Merivale, 67; 2 Kent's Com., pp. 227, 430; Burge's Com. 1, p. 39.) "

Again, later on, the court states: " Children, says Pothier, have

the domicile their mother establishes, without fraud, so long as remaining in widowhood she preserves the quality of chief of the family. * * *. (Pothier, Introd. aux Coutumes, p. 9, § 19; See *Inhabitants of Freetown* v. *Inhabitants of Taunton*, 16 Mass. R. 52; *School Directors* v. *James*, 2 Watts and Serg. 568.) "

In *Lamar* v. *Micou* (112 U. S. 452, 470) it was said: " An infant cannot change his own domicile. As infants have the domicile of their father, he may change their domicile by changing his own; and after his death the mother, while she remains a widow, may likewise, by changing her domicile, change the domicile of the infants; the domicile of the children, in either case, following the independent domicile of their parent. *Ryall* v. *Kennedy*, 67 N. Y. 379; *Potinger* v. *Wightman*, 3 Meriv. 67; *Dedham* v. *Natick*, 16 Mass. 135; Dicey on Domicile, 97–99."

And (at p. 471) the court states: " The father, and after his death the widowed mother, being the natural guardian, and the person from whom the ward derives his domicile, may change that domicile. But the ward does not derive a domicile from any other than a natural guardian."

The text book writers generally state the same thing. In Rodgers on Domestic Relations (§ 656) it is stated: " As every one must have a domicile, it follows that an infant, just as other persons, likewise must. But an infant can do few acts in law which are binding on him; therefore, with reference to his domicile, as well as to other rights of an infant, the law fixes this status, and deems the domicile of the parents of the child the domicile of the infant. If the domicile of the parent at the time of his death is different from that at the time of the birth of the infant, the infant will take the last domicile of the parent. But if the father be dead and the mother alive, the domicile of the infant goes thereafter with the mother until her death. * * *. In case of the death of the father, the infant takes the mother's domicile."

In Jacob's Law of Domicil (§ 238) the author states: " Upon the death of the father, usually the mother becomes the head of the family, and it would seem but natural and proper that henceforth her infant children should depend upon her for their domicile, at least as long as she remains an independent person and capable of choosing her own domicile. And this, with certain qualifications and limitations, has generally been admitted, both by Continental and Anglo-American jurists, although the question has been somewhat complicated by considering it along with the question of the power of a guardian to change the domicile of his minor ward. Indeed, little has been said against it, beyond the denial implied in the assertion by some jurists that the infant child retains the

domicile of the father after the death of the latter.    But this assertion has usually been made either carelessly, or in view of the fact of the father surviving the mother."

In Woerner's American Law of Guardianship (§ 26, p. 80) it is said: " The residence of infants conferring the jurisdiction in the sense of these statutes means domicile, or home, as distinguished from residence, which may .be temporary, or for a special purpose. The domicile of an infant is that of his father, if legitimate, or of his mother, if illegitimate, or after the father's death, or of a grandparent or other person standing *in loco parentis*.    The placing of a child by its father in the custody of a person residing in another county does not affect the child's domicile, nor the mother's right to its custody and care after the father's death; so that after her death the jurisdiction to appoint a guardian is in the county in which she was domiciled at the time, although she had been adjudged insane before the father's death, and never declared restored. This domicile remains until the infant legally acquires another; and since the law conclusively disables infants from acting for themselves during minority, their domicile cannot be altered by their own acts before reaching majority.    *    *    *.    The authorities are substantially unanimous in according to the mother, while remaining a widow, the power to alter the domicile of her infant children by changing her own."

In Dicey on Domicile (p. 103) it is said:  " If the infant's father dies, the infant's domicile follows, in the absence of fraud, that of its mother, until such time as the mother remarries, when, by reason of her own domicile being subordinated to that of her husband, that of the infant ceases to follow any further change by the mother, or in other words, does not follow that of the step-father," citing *Ryall* v. *Kennedy* (67 N. Y. 379).

In 19 Corpus Juris (p. 412) it is said:  " (§ 26) 2. After Father's Death.    If the father dies during the infant's minority, the infant's domicile is that of the father at the time of his death; but thereupon the power to fix the domicile devolves upon the mother, and the infant's domicile follows that of the mother, who may alter it at pleasure, provided it is without fraudulent motives respecting the succession of the estate of the infant.    But this power may be exercised only so long as the mother remains a widow, since, should she remarry, by reason of her own domicile becoming subordinate to that of her husband, that of the infant becomes fixed and ceases to follow any further change by the mother or stepfather.    There is, however, authority to the contrary, holding that remarriage does not affect the mother's right to fix her child's domicile."

There are decisions in other States to the same effect.  (*Taylor* v.

*Jeter*, 33 Ga. 195; *Modern Woodmen* v. *Hester*, 66 Kans. 129; *Garth* v. *City Savings Bank*, 120 Ky. 280; *DeJarnett* v. *Harper*, 45 Mo. App. 415; *Matter of Russell*, 64 N. J. Eq. 313; *Mears* v. *Sinclair*, 1 W. Va. 185; *Chumos* v. *Chumos*, 105 Kans. 374.)

On the other hand, Schouler's Marriage, Divorce, Separation and Domestic Relations (Vol. 1 [6th ed.], p. 928) states: " The court of the domicile of the ward has jurisdiction over his guardianship. The last domicile of a father is on his death the domicile of his minor children, where application for guardianship should primarily be made."

In *Desribes* v. *Wilmer* (69 Ala. 25, 31) the court said: " The domicile of the father at the time of his death, is the domicile of his infant child. No one, not even the mother of such child, can, of his or her mere volition, change the inherited domicile of such child. (*Johnson* v. *Copeland*, 35 Ala. 521.) "

In American and English Encyclopædia of Law (Vol. 15 [2d ed.], p. 33) it is stated: " The domicile of an infant, for the purpose of conferring jurisdiction to appoint a general guardian, primarily arises from the domicile of the father, or, if the father be dead, from his domicile at the time of death. * * *. But if, since the father's death, the mother, without fraudulent intent, has removed her residence and that of the child to another jurisdiction, the infant's domicile will be deemed to follow that of the mother."

Other similar expressions may also be cited, but a review of the authorities upon the subject convinces me that it may be safely concluded in the present case that the domicile of the infant's mother determines the domicile of the minor child unless an exception to the general rule should be made by reason of the decree of divorce between the parents.

As already pointed out, this decree gave absolute custody of the child to the father, and a finding of the referee that the mother was unfit to have the custody of the child was confirmed by the interlocutory decree. The respondents insist that the custody of the infant having been denied the mother by the final judgment of divorce, the domicile of the child, under such circumstances, would not change to that of the other parent upon the death of the guardian to whom the court has given the child. In other words, the respondents assert that the decree of divorce having given the absolute and sole custody of the child to the father, and the domicile of the child having been thereby fixed as that of the father, this decree is final with respect to the custody of the infant, and that the domicile of the infant cannot, therefore, be changed, except by a decree of the court.

The cases cited by respondents to uphold this proposition do

not appear to me to be in point. The facts presented are not similar and in some cases the decisions turned upon the construction of local statutes.

On the other hand, we find some expression of judicial opinion in the courts of New York State that apparently support the contention of the appellant that the effect of the decree of divorce granted Mr. Thorne against his wife expired with his death, and that the mother's rights as natural guardian of her child were thereupon restored.

In *Matter of Robinson* (17 Abb. Pr. 399) it appeared that Robinson was divorced from his wife on account of his adultery, and the custody of the children was given to the mother. The mother died and the children petitioned the court for the appointment of a trustee to receive and pay over to them the moneys which the decree of divorce provided that the father should pay to the mother for the support of the children. The father opposed this application on the ground that the order of the court, contained in the decree of divorce, expired with the death of the mother. This contention was sustained, the court holding that the judgment of divorce had no effect beyond the period of the joint lives of the parties; that the father's rights over the children were restored; that he was bound to provide for their wants and entitled to their care and custody.

In *Matter of Waring* (46 Misc. 222) there is a statement to the effect that the provision in the decree of divorce taking from the husband the control and custody of his children is a penalty imposed which ceases upon the death of the wife and that the father thereupon becomes entitled to all his statutory rights.

In *Matter of de Saulles* (101 Misc. 447) the effect of a decree of divorce after the death of one of the parties was involved, and it appeared that there were explicit provisions regarding the custody and control of the child, each parent being allowed custody for a portion of each year. The surrogate was of the opinion that the decree fixing the custody of the child was intended to apply only during the joint lives of the parents. In the course of the opinion Surrogate FOWLER stated as follows: " But I am satisfied that the decree of the Supreme Court adjudging the control of the parents and their issue could not intend any operation beyond the death of either parent. Certainly it could have no possible operation after the death of the father and it is but fair, I think, to the Supreme Court to presume that it did not intend to do what it could not do. On the happening of the death of the father all matters of status of the parties and their infant ceased to be affected by the decree of divorce and were remitted to the common

law, which alone fixed their further status. The decree in the divorce action, in other words, ceased on the death of the father to have any further future operation in my humble opinion."

In *Matter of Deming* (10 Johns. 232, 483) it was held that where the father had been sentenced to State's prison for life, but afterwards pardoned, he was restored to his rights and duties as a parent, and entitled to the custody of his infant children who had been in the custody of the mother, who had married after her first husband's imprisonment. It was held that while the pardon could not affect or annul the validity of the second marriage, it had the effect of restoring to the man pardoned the full relation of a father, as well as the duties of a parent; that he was bound to maintain and protect his infant children and consequently entitled to their custody.

After careful consideration, I conclude that the surrogate of Dutchess county did not have jurisdiction to make the orders appointing the guardians in question; that when Mr. Thorne died, the domicile of the mother, the natural guardian of the child, became the domicile of the child, and that jurisdiction to appoint a guardian for him was vested in the Surrogate's Court of the mother's residence.

If I am correct in this conclusion, it becomes unnecessary to consider the other questions raised upon the appeal.

I advise that the order appealed from be reversed upon the law, with ten dollars costs and disbursements, and that the motion to vacate the orders of the Surrogate's Court of Dutchess county, dated July 2, 1924, appointing guardians of the infant Joel Wolfe Thorne, Jr., as well as the letters of guardianship issued thereon, be granted.

KELLY, P. J. and KELBY, J., concur; MANNING and KAPPER, JJ., dissent.

Order of the Surrogate's Court of Dutchess county reversed upon the law, with ten dollars costs and disbursements, and orders of said Surrogate's Court appointing guardians of the property and guardian of the person of the infant vacated. Settle order on notice.